**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No. 19-cv-01913-REB-NRN

UNITED STATES OF AMERICA

      Plaintiff,

vs.

THE DURANGO & SILVERTON NARROW GAUGE RAILROAD COMPANY,
a Colorado Corporation, and
AMERICAN HERITAGE RAILWAYS, INC., a Florida Corporation,

      Defendants.

---

## ORDER OVERRULING OBJECTIONS TO AND ADOPTING RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Blackburn, J.**

      The matters before me are (1) the recommendation contained within the **Report and Recommendation on Defendants' Partial Motion To Dismiss (Dkt. #8)** [#37],[1] filed December 27, 2019; and (2) defendants' **Objections to Magistrate Judge's Report and Recommendation on Defendants' Partial Motion To Dismiss** [#41], filed January 10, 2020.  I overrule the objections, approve and adopt the recommendation, and deny defendants' corresponding motion to dismiss.

      As required by 28 U.S.C. § 636(b), I have reviewed *de novo* all portions of the recommendation to which cognizable objections have been filed.  I have considered carefully the recommendation, objections, and applicable caselaw.  This case presents

---

[1] "[#37]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF).  I use this convention throughout this order.

an issue of statutory interpretation made more challenging by the fact that the statute in question, as well as most of the caselaw interpreting it, is more than one hundred years old. The magistrate judge has done yeoman-like work in parsing the parties' arguments (both as presented in the briefs and at a hearing regarding the motion) and the relevant authorities.  He has cogently considered and analyzed the issues raised by and inherent to the motion.  His recommendation is thorough, thoughtful, and, ultimately, persuasive, and I approve and adopt it as an order of this court.  The discussion herein is meant merely to supplement, not supplant, his excellent work.

The question presented by the instant motion is whether the United States government, as plaintiff, can recover the more than $30 million it expended in fighting the "416 Fire," a devastating wildfire that burned for six months and destroyed some 53,000 acres of the San Juan National Forest.  The government alleges the fire was caused when burning cinders or other hot materials escaped from the exhaust stack of one of defendants' coal-burning steam engines and ignited a brush fire adjacent to the railroad tracks.

The government seeks to recover these costs under Colorado's "Railroad Statute," which provides, in its entirety:

> Every railroad company operating its line of road, or any part thereof, within this state shall be liable for all damages by fires that are set out or caused by operating any such line of road, or any part thereof, in this state, whether negligently or otherwise. Such damages may be recovered by the party damaged by a proper action in any court of competent jurisdiction; but said action shall be brought by the party injured within two years next ensuing after it accrues. The liability imposed in this section shall inure solely in favor of the owner or mortgagee of the property so damaged or destroyed by fire, and the same shall not pass by

2

> assignment or subrogation to any insurance company that
> has written a policy thereon.

§40-30-103, C.R.S.  Although the statute makes railroad companies strictly liable for "all damages by fires that are set out or caused" by their operations, *see British American Assurance Co. v. Colorado & Southern Railway Co.*, 125 P. 508, 510 (Colo. 1912); *Union Pacific Railway Co. v. Arthur*, 29 P. 1031, 1032 (Colo. App. 1892), defendants insist it does not allow recovery of fire suppression costs.  I concur with the magistrate judge that, to the contrary, it does.[2]

I reject out of hand defendants' suggestion that the magistrate judge erroneously relied on *United States v. Boone*, 476 F.2d 276 (10th Cir. 1973),[3] in concluding that fire suppression costs were recoverable, principally because the judge did not cite *Boone* for that proposition.  Instead, he relied on *Boone* to conclude – responsive to arguments put forth in defendants' motion to dismiss – that when the government is a landowner, it "is entitled to whatever protection is afforded to other landowners in Colorado."  (**Recommendation** at 15.)  In other words, if the Railroad Statute otherwise provides for the recovery of fire suppression costs, the United States as a landowner protecting its own property is entitled to recover them to the same extent as a private

---

[2]  Defendants' objection that the recommendation is premature because the court has not yet ruled on their motion to certify questions to the Colorado Supreme Court is moot.  (**See Order Denying Defendants' Motion for Issuance of Certified Questions to the Colorado Supreme Court Pursuant to C.A.R. 21.1 and Motion for Leave To Submit Amicus Brief** [#83, filed June 1, 2020.)

[3]  To the extent defendants further suggest it was error for the magistrate judge to consider this authority because neither party cited it in their briefs, I reject any such argument.  *See Elder v. Holloway*, 510 U.S. 510, 512, 114 S.Ct. 1019, 1021, 127 L.Ed.2d 344 (1994) (court's review "is to be conducted in light of all relevant precedents, not simply those cited to, or discovered by, the district court").

party.[4]

I also find and conclude that the magistrate judge correctly applied Colorado's principles of statutory construction. ***See Citizens for Responsible Government State Political Action Committee v. Davidson***, 236 F.3d 1174, 1190 (10th Cir. 2000) ("We interpret state laws according to state rules of statutory construction.").  Although an unambiguous statute should be enforced as drafted, ***see Klinger v. Adams County School District No. 50***, 130 P.3d 1027, 1031 (Colo. 2006); ***Slack v. Farmers Insurance Exchange***, 5 P.3d 280, 284 (Colo. 2000), the magistrate judge correctly concluded that the Railroad Statute is ambiguous as to what damages are recoverable thereunder.[5]

---

[4]  Defendants complain of the magistrate judge's purported failure to address their argument that because there is no federal common law right to recover fire suppression costs, a state statute must specifically so provide. (**Obj.** at 13; **Motion To Dismiss** at 7-9, 11-12.)  The first part of this argument is irrelevant, since the government seeks to recover exclusively on Colorado state statutory law.  The latter is based on a misconception that because other states have enacted statutes specifically providing for the recovery of fire suppression costs, such costs are not recoverable in the absence of such a statute.  While I agree that such a statute would simplify matters greatly, the caselaw on which defendants rely does not support their argument.  Instead, these cases apply the "municipal cost recovery rule" or  "free public services doctrine," which provides that " absent specific statutory authorization or damage to government-owned property, a county cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services."  Barbara J. Van Arsdale, J.D., *Construction and Application of "Municipal Cost Recovery Rule," or "Free Public Services Doctrine*," 32 A.L.R. 6th  261 (2008).  This rule does not apply to a landowner protecting its own property.  Indeed, ***People v. Wilson***, 240 Cal. App. 574 (1966), which defendants cite in support of their position, actually highlights this distinction, as the court there noted it found no authority "which permits, in the absence of a statute, the recovery of fire suppression expenses *by one not protecting his own property*."  ***Id.*** at 576 (emphasis added).  Thus, and although the magistrate judge addressed this issue, albeit somewhat indirectly, even if he had not, I would find no cognizable basis for objection in this regard.

[5]  Respectfully, I am not persuaded by the reasoning of the state court district judge who reached the opposite conclusion.  (***See*** **Order Re: Briefing on C.R.S. § 40-30-103 and Partial Motion To Strike Railroad Defendants' Affirmative Defenses as Related to § 40-30-103** at 18-20, in ***The Lawrence M. Cohen Family Trust by and through Householder, Trustee v. American Heritage Railways, Inc., et al.***, Case No. 2018CV30155 (D. Ct., LaPlata County, Oct. 8, 2019) (filed as Exh. A. to **Def. Reply to Motion To Dismiss** [#24-1].)  Not only am I not bound by that determination, ***see State Farm Mutual Automobile Insurance Co. v. Travelers Indemnity Co.***, 433 F.2d 311, 312 (10th Cir. 1970), but it appears largely based on the fact that fire suppression costs had not been sought in any previous case under the Railroad Statute.  That observation, however, proves no more than that such costs were not requested, not that they were not available.

This ambiguity lies in the interplay between the statute's first and third clauses. The first – the liability clause – makes railroad companies strictly liable "for all damages by fires that are set out or caused by" the operation of their railroads. §40-30-103, C.R.S.  The third – the anti-subrogation clause – provides a property owner may not assign or subrogate his right to recover under the statute to any insurer who may hold a policy on "the property so damaged or destroyed by fire."  If "all damages" in fact means *all* damages, a landowner's cost of containing and suppressing a fire should be recoverable as a foreseeable consequence of such fire.  On the other hand, if defendants are correct and the anti-subrogation clause limits recoverable damages to only damage done to physical property, the statute does not, as its liability clause suggests, allow recovery of "all damages."

Because the statute is thus ambiguous, the magistrate judge appropriately turned to other indicia of legislative intent.  *See* §2-4-203, C.R.S.; *Klinger*, 130 P.3d at 1031. He began by noting the overarching goal in interpreting any statute is to consider and effectuate the intent of the General Assembly in enacting it.  *State v. Nieto*, 993 P.2d 493, 500 (Colo. 2000); *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 422 (Colo.1991).  As relevant here, the legislative purpose animating the Railroad Statute was clearly articulated in *Union Pacific Railway Co. v. De Busk*, 20 P. 752 (Colo. 1889):

> [N]o discrimination was either expressed or intended in favor
> of private individuals, or against railroad corporations, by our
> statute making them liable for damages by fire caused by the
> operation of their trains.  The object of the statute was to
> give an adequate remedy to those who should suffer
> damages . . . caused by the operation of locomotive engines
> by the dangerous agency of steam.  The object of the act

5

> was not to punish railroad corporations, but was to declare
> upon whom the loss must fall in case damage by fire should
> ensue by the operations of railroads.

*Id.* at 756.  Thus, the statute is intended to shift the risk of fires occasioned by railroad

company operations from "those who are exposed to it" to "those who are thus

authorized to use a somewhat dangerous apparatus, and who realize profit from it." *Id.*

at 758 (citation and internal quotation marks omitted).

The adoption of the anti-subrogation clause in 1903 did not change that

overarching purpose.  Following passage of the 1903 amendment, Colorado courts

continued to recognize that "[t]he statute . . . was enacted to settle upon whom the loss

[from fire] should fall, and, because of the peculiar manner in which railway companies

use this dangerous element, it casts the responsibility of employing it on them." *British*

*American Assurance Co.*, 125 P. at 511.  Risk-shifting statutes such as this are

remedial in nature and accordingly "should receive from the courts a reasonable and

liberal interpretation and construction, such as will justly promote their object." *De*

*Busk*, 20 P. at 758.

Moreover, it is important to recognize what the anti-subrogation clause was

designed to accomplish – and what it was not.  Although there is little legislative history

about the measure, it is no great stretch to surmise that the 1903 amendment was

responsive to the Colorado Court of Appeals' decision in *Crissey & Fowler Lumber*

*Co. v. Denver & Rio Grande Railroad Co.*, 86 P. 670 (Colo. App. 1902).  In that case,

the court reversed the trial court decision directing a verdict in favor of the defendant

railroad company and, of particular relevance, rejected the railroad's assertion that "the

insurance companies cannot be subrogated to the owner's rights in an action where recovery is claimed solely by virtue of the statute." *Id.* at 677.[6]

The *Crissey & Fowler* case was one of many which arose out of the devastating "Antlers Fire" of October 1, 1898, which burned a substantial portion of downtown Colorado Springs.[7]  The fire begat a significant number of lawsuits, in most of which insurance companies appeared as subrogees of their insureds.  *See Suit of Peterson vs. Rio Grange Up in County Court*, COLORADO SPRINGS GAZETTE, Jan. 20, 1900 ("The insurance companies which were heavy sufferers in the great fire of October 1, 1898, are watching the case very closely. . . . [I]f it is successful there will be many more and heavier suits filed against the [railroad] company.").[8]  *See also Rio Grande Sued for $200,000*, COLORADO SPRINGS GAZETTE, Feb. 6, 1900 (reporting the filing of two more

---

[6]  Contemporary reports show the railroad argued that "the insurance company could not collect the damages it might have to pay, because it had been paid a premium for risking those damages."  *Rio Grande is Responsible*, COLORADO SPRINGS GAZETTE, Feb. 13, 1902.  The court of appeals rejected that contention:

> It should not lie in its mouth to say to the insurance company which has paid the loss, "You took into consideration the great risk when you made the contract of insurance, and the statute gives to the owner only the right of recovery, and I, although the cause of the loss, will reap the insurance benefits."

*Crissey & Fowler Lumber Co.*, 68 P. at 678.  Instead, the court found nothing in the Railroad Statute which evidenced an intent to abrogate the common law right of subrogation and concluded it was "immaterial to whom the defendant railroad company should pay the loss . . . provided that it be not required to pay it twice."  *Id.* at 677-78.

[7]  The fire started in a pile of trash underneath the platform at the Denver and Rio Grande freight depot in Colorado Springs.  Carried by high winds, the fire quickly burned out of control, ultimately destroying a large portion the central business district, including the historic Antlers Hotel.  The total estimated loss from the fire was $1,000,000, *see Big Fire in Colorado Springs*, NEW YORK TIMES, Oct. 2, 1989, the equivalent of nearly $31,000,000 in today's money, *see* CPI Inflation Calculator (available at: https://www.in2013dollars.com/us/inflation/1898?amount=100) (last accessed June 1, 2020).

[8]  I gratefully acknowledge my profound debt of gratitude to the Tenth Circuit librarians, and in particular, Mr. Albert Seiber, for their invaluable help in identifying and retrieving these and other contemporaneous materials.

lawsuits by insurers soon after the *Peterson* trial). These suits "dragged on" for five years, *Suits Settled on Basis of $45,000*, COLORADO SPRINGS GAZETTE, July 17, 1903, undoubtedly at great cost to the litigants.[9]

Contemporaneous reports[10] concerning Senate Bill No. 234, which added the anti-subrogation clause to the Railroad Statute, excoriated it as a "snake bill," one "so adroitly drawn as to appear at first sight as bills that would greatly benefit the public and hurt the corporations if they were enacted into laws" but instead "is an attempt on the part of the railroad companies to relieve themselves of the just liability which exists under the statutes of the state, and to prevent the enforcement, through subrogation, of claims for losses by fire cause in the operating of their roads." *"Cinch" Bill for Railways*, DENVER POST, March 29, 1903. The *Post* characterized the bill as a "Scheme to Beat [the] Farmer" by "exclud[ing] the [insurance companies] from the fight and giv[ing] the railroad the advantage of fighting the individual . . . with its millions of backing against his poverty." A *Scheme to Beat Farmer*, DENVER POST, March 26, 1903.[11] The insurance companies, however, appear to have had less sway than the railroads in this instance, as their lobbying efforts were unsuccessful in defeating the bill, ***see*** *Deception*

---

[9] After ***Crissey & Fowler*** was remanded to the trial court, the remaining pending lawsuits were consolidated for trial, but the jury could not reach a verdict. ***See*** *Antler's Fire Jury Could Not Agree*, COLORADO SPRINGS GAZETTE, July 15, 1902. A year later – after the passage of the 1903 amendment to the Railroad Statute – the consolidated suits were settled for $45,000. *Suits Settled on Basis of $45,000*, COLORADO SPRINGS GAZETTE, July 17, 1903.

[10] ***See*** §2-4-203(1)(b), C.R.S. ("If a statute is ambiguous, the court, in determining the intention of the general assembly, may consider among other matters . . . (b) The circumstances under which the statute was enacted.").

[11] It also was noted that a similar bill passed in Oregon led to a fifty percent increase in insurance rates. *"Cinch" Bill for Railways*, DENVER POST, March 29, 1903.

*Charged*, DENVER POST, March 29, 1903, and a motion to strike the anti-subrogation clause failed to pass by a vote of 10 to 22, *see* Senate Journal, 14th Gen. Assemb., *Report of the Committee of the Whole* at 992-93 (Colo. March 25, 1903).

What appears from this history is the largely unsurprising conclusion that the anti-subrogation clause was intended to accomplish exactly what its language suggests – to prevent injured parties from involving their insurance companies in litigation to recover under the Railroad Statute.  While this addition certainly was favorable to railroads insofar as it limited the common law right of subrogation, there was no apparent consideration given to limiting the type or amount of damages that could be sought.  Notably, the legislature did not appreciably alter the liability clause in 1903.[12] *See British American Assurance Co.*, 125 P. at 510 ("The liability clause in the act of 1903 only reenacts the pre-existing liability.")

Moreover, the Colorado Supreme Court thereafter affirmed that "[t]he purpose of the [1903 amendment] is not to change the liability of the railway company to [the plaintiff]; but to destroy the right of the owner to assign to the insurance company any liability of the railway company." *Id.* at 511.  The Colorado high court reiterated this point several years later, concluding that "[w]hen the history of this act is taken into consideration, we cannot agree that the statute was intended to in any manner lessen

---

[12]  Previous versions of the statute referred to "all damages by fire that is caused by"operation of a railroad.  *See* Act of Jan. 13, 1874, 1874 Colo. Sess. Laws 224 (emphases added); Act of March 31, 1887, 1887 Colo. Sess. Laws 368 (emphases added).  The 1903 amendment rendered the clause in the plural, such that thereafter (and still today) it reads "all damages by fires that are caused by" railroad operations. *See* Act of April 9, 1903, ch. 153, 1903 Colo. Sess. Laws 404 (emphases added).  (Since that time, the substance of the law has remained unchanged, despite numerous recodifications and stylistic changes. *See* Colo. Rev. Stat. § 5512 (1908); Colo. Comp. Laws § 2892 (1921); Colo. Stat. Ann. ch. 139, § 78 (1935); § 116-11-3, C.R.S. (1953); § 116-11-3 , C.R.S. (1963); § 40-30-103, C.R.S. (1973).)

the liability of railroad companies to owners upon account of such fires." ***Rhinehart v.
Denver & Rio Grande Railroad Co.***, 158 P. 149, 153 (Colo. 1916), ***overruled in part
on other grounds by Morgan County Junior College District v. Jolly***, 452 P.2d 34
(Colo. 1969).  In other words, the addition of an anti-subrogation clause was not
intended to limit a railroad company's potential liability under the Railroad Statute.

　　　Thus, I turn, as did the magistrate judge, to the liability clause, which uses the
phrase "all damages" to describe the scope of the railroad companies' liability
thereunder.  As the magistrate judge aptly noted, the term "damages" is a legal term of
art.  ***See In re HomeBanc Mortgage Corp.***, 945 F.3d 801, 812 (3rd Cir. 2019); ***In re
Ribozyme Pharmaceuticals, Inc. Securities Litigation***, 192 F.R.D. 656, 661 (D. Colo.
2000).  "[E]very first-year law student learns to automatically connect 'damages' with
what is potentially recoverable in court, and not necessarily an underlying loss or injury."
***In re HomeBanc Mortgage Corp.***, 945 F.3d at 812.  Moreover, the legal definition of
"damages" has not changed between the date of the Railroad Statute's enactment (or,
for that matter, its last amendment) and today.  Then, as now, "damages" connotes
"[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or
injury." *Damages*, **Black's Law Dictionary** (11th ed. 2019).  ***Compare*** Martin L. Newell,
*A Treatise on the Law of Malicious Prosecution, False Imprisonment, and the Abuse of
Legal Process* § 41.1 at 491 (1892) ("Damages – "[a] sum of money adjudged to be
paid by one person to another as compensation for a loss sustained by the latter in
consequence of an injury committed by the former in violation of some right.") (available
at:  https://archive.org/details/atreatiseonlawm00newegoog/page/n562/mode/

10

2up/search/491) (last accessed June 1, 2020).

More to the point, damages are compensatory in nature and thus "are intended to make the injured party whole[.]" ***Seaward Construction Co. v. Bradley***, 817 P.2d 971, 974 (Colo. 1991).  ***See also Board of County Commissioners of Weld County v. Slovek***, 723 P.2d 1309, 1317 (Colo. 1986) (measure of damages is amount "truly and reasonably necessary to achieve the cardinal objective of making the plaintiff whole").  That same understanding of the meaning and purpose of damages pertained at the time the Railroad Statute was enacted.  ***See Birdsall v. Coolidge***, 93 U.S. 64 (3 Otto), 64, 23 L.Ed. 802 (1876) ("Compensatory damages and actual damages mean the same thing; that is, that the damages shall be the result of the injury alleged and proved, and that the amount awarded shall be precisely commensurate with the injury suffered, neither more nor less, whether the injury be to the person or estate of the complaining party."); ***Gray v. Linton***, 88 P. 749, 752 (Colo. 1906) (measure of damages is "that which aims at actual compensation for the injury.  That means, if it means anything, the entire injury, not one part of it, but every portion of it that is the natural result of the wrong").

Because courts "presume that the legislature had knowledge of the legal import of the words it used," ***Granite State Insurance Co. v. Ken Caryl Ranch Master Association***, 183 P.3d 563, 567 (Colo. 2008),[13] I must conclude that in using the term

---

[13] ***See also Morissette v. United States***, 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.").

"damages," the Colorado legislature knew and intended that amounts awarded under the Railroad Statute would be those found sufficient to make the injured party whole.[14] Notably, when the legislature added the anti-subrogation clause, it spoke not of "damages" incurred by property owners but of those persons whose property was "damaged."  Contrary to defendants' arguments, these are not the same term. "Damage" describes the condition of the plaintiff's property and the nature of his injury; "damages" is the legal term of art which connotes the amount necessary to make the plaintiff whole for that injury.  Interpreting the Railroad Statute to permit a plaintiff who has sustained property damage to recover "all damages," including any fire suppression costs, sustained as a result of fire harmonizes the two clauses of the Railroad Statute in a way which gives appropriate scope and effect to each.  *Proactive Technologies, Inc. v. Denver Place Associates. Ltd. Partnership*, 141 P.3d 959, 961 (Colo. App. 2006) ("In construing a statute, an appellate court must read and consider the statute as a whole and interpret it to give harmonious effect to all its parts.").  Thus, I am in agreement with the magistrate judge that fire suppression costs are recoverable under the Railroad Statute.

Defendants argue that because the technological innovations in fire suppression available today were unknown in 1903, the legislature could not have contemplated that landowners might one day employ their own fire suppression apparatuses.  Assuming *arguendo* the factual accuracy of this statement, it does not follow that fire suppression costs are not recoverable.  In interpreting a statute's intent, the court is not "trapped in a

---

[14] The magistrate judge meticulously addressed this issue, and I will not repeat his incisive analysis here other than to say that I find it cogent.  (*See* **Recommendation** at 21-24.)

[] time warp, forever limited" to the understanding of what constituted recoverable damages in 1903.  *Wisconsin Central Ltd. v. United States*, – U.S. --, 138 S. Ct. 2067, 2074, 201 L.Ed.2d 490 (2018) (citation and internal quotation marks omitted).  For "[w]hile every statute's meaning is fixed at the time of enactment, new applications may arise in light of changes in the world." *Id.*  Accordingly, "[t]he General Assembly is not required to reenact a statute whenever new technology or changed conditions . . . might affect the scope of the statute's coverage." *Town of Telluride v. Lot Thirty-Four Venture, L.L.C.*, 3 P.3d 30, 36 (Colo. 2000) (citation and internal quotation marks omitted), *as modified on denial of reh'g* (Feb. 26, 2000).  *See also AT & T Communications of Mountain States, Inc. v. State*, 778 P.2d 677, 682 (Colo.1989) (a statute is "not frozen in time" as of its enactment date).  As noted above, the legal term "damages" had the same meaning at the turn of the last century as it does today: the amount necessary to make the plaintiff whole.  What may be necessary to achieve that objective today may have changed in the last one hundred years, but the underlying principle remains steadfast.

Nor am I persuaded that the statute's reference to "damages by fires" confines its reach to only property burned.  There is nothing self-evident about this construction.  Indeed, in light of the particular legal significance of the term "damages" and the overarching purposes of the Railroad Statute, an interpretation which construes "all damages" (i.e., that amount required to make the injured party whole) as those which are "[caused] by fires caused by" the operation of railroads seems more apt.  That construction both harmonizes the purposes of the Railroad Statute with its language

and provides a well-recognized limit, namely legal causation, on the aspects of damages recoverable under the statute.  Thus, like the magistrate judge, I am not concerned that allowing recovery of fire suppression costs under the Railroad Statute will open the Pandora's box of unlimited liability which defendants predict.

Finally, I do not believe the magistrate judge erred in concluding that disallowing fire suppression costs would, at best, be contrary to the duty to mitigate, and at worst, create a perverse incentive to expend no effort to attempt to suppress fires.  Defendants argue that such a construction discourages land owners from taking measures to reduce the risk of fire by, in this particular instance, clearing potential fuel from the forest.  That is not the law.  Because injured parties have "no duty to anticipate a defendant's negligence," the duty to mitigate arises only "after the original injury has occurred."  *Lascano v. Vowell*, 940 P.2d 977, 983 (Colo. App. 1996).  *See also  Burt v. Beautiful Savior Lutheran Church of Broomfield*, 809 P.2d 1064, 1068 (Colo. App. 1990) (citing W. Prosser & W. Keeton, **The Law of Torts** § 65 (5th ed. 1984)).  There thus is nothing objectionable in the magistrate judge's common sense observation, which has the additional benefit of being consistent with the Colorado rule of statutory construction which presumes the legislature intended "[a] just and reasonable result." §2-4-201(1)(c), C.R.S.

Accordingly, I overrule defendants' objections, approve and adopt the recommendation of the magistrate judge, and deny defendants' motion to dismiss.

**THEREFORE, IT IS ORDERED** as follows:

1. That the objections presented in defendants' **Objections to Magistrate Judge's Report and Recommendation on Defendants' Partial Motion To**

14

**Dismiss** [#41], filed January 10, 2020, are overruled;

2.  That the recommendation of the magistrate judge contained in the **Report and Recommendation on Defendants' Partial Motion To Dismiss (Dkt. #8)** [#37], filed December 27, 2019, is approved and adopted as an order of this court; and

3.  That **Defendants' Motion To Dismiss Pursuant to Fed. R. Civ. Pro. 12(b)(6)** [#8], filed September 9, 2019, is denied.

Dated June 1, 2020, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge