## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01913-REB-NRN

UNITED STATES OF AMERICA,

     Plaintiff,

v.

THE DURANGO & SILVERTON NARROW GAUGE RAILROAD COMPANY,
a Colorado Corporation, and
AMERICAN HERITAGE RAILWAYS, INC., a Florida Corporation,

     Defendants.

---

## CONSENT DECREE

---

WHEREAS, the Plaintiff United States of America, acting through the United States Department of Justice, and on behalf of the United States Forest Service ("USFS") and Bureau of Land Management ("BLM") (collectively, the "United States") filed a complaint against Defendants The Durango & Silverton Narrow Gauge Railroad Company ("DSNGR") and American Heritage Railways, Inc., ("AHR") (collectively, "Defendants"), in the United States District Court for the District of Colorado captioned *United States v. The Durango & Silverton Narrow Gauge Railroad Company, and American Heritage Railways, Inc.*, Civil Action Number 19-cv-01913-REB-NRN (D. Colo.) (the "Civil Action");

WHEREAS, the complaint in the Civil Action alleges that Defendants violated Colorado Revised Statutes § 40-30-103;

1

WHEREAS, the complaint in the Civil Action alleges that a wildfire ignited on June 1, 2018, at a location called Shalona Hill, which is between Durango, Colorado, and Silverton, Colorado (the 416 Fire); that the 416 Fire was ignited adjacent to a railroad track on which Defendants operated and maintained a narrow-gauge railroad line traveling between Durango, Colorado, and Silverton, Colorado; that Defendants operate the railroad line pursuant to a right-of-way on public lands; that the 416 Fire was ignited by particles emitted from an exhaust stack on a coal-burning, steam-powered train engine owned and operated by Defendants; that Defendants are strictly liable for causing the 416 Fire; and that the 416 Fire burned 54,130 acres of the San Juan National Forest near Durango, Colorado, causing the United States to incur damages in the form of fire suppression costs and damage to the National Forest. The Civil Action claims that the United States is entitled under Colo. Rev. Stat. § 40-30-103 as the owner of the National Forest to recover damages from the Defendants. The claim and allegations set forth in the Civil Action are collectively referred to as the "Covered Conduct";

WHEREAS, if successful in the Civil Action the only remedy to which the United States would be entitled is an award of money damages, interest and costs;

WHEREAS, Defendants deny the United States' allegations that the 416 Fire ignited in the manner or location claimed by the United States, deny that the United States is entitled to recover fire suppression costs as damages under applicable Colorado law; deny that the United States has suffered compensable damages; and deny that Defendant AHR operates the line of railroad between Durango and Silverton or is otherwise liable under applicable Colorado law. Defendants allege that the United States is at fault for the damages allegedly suffered and therefore is not entitled to recover or its damages must be

2

reduced by its comparative fault;

WHEREAS, the following state court civil actions (hereafter collectively referred to as "State Court Actions") have been filed against Defendants relating to the 416 Fire:

(A) On September 7, 2018, an action was filed in the District Court for La Plata County, Colorado, captioned *The Lawrence M. Cohen Family Trust et al. v. American Heritage Railways, Inc.*, Case Number 2018CV30155 (D. Ct., La Plata County); and

(B) On February 3, 2020, an action was filed in the District Court for La Plata County, Colorado, captioned *Ohio Security Insurance Co. v. American Heritage Railways, Inc. and The Durango & Silverton Narrow Gauge Railroad Company,* Case Number 2020CV30010 (D. Ct., La Plata County);

(C) On May 29, 2020, an action was filed in the District Court for La Plata County, Colorado captioned *Granite State Insurance Company v. American Heritage Railways, et al.,* 2020-CV-30078 (D. Ct. La Plata County).

WHEREAS, Defendants intend to enter into a separate agreement with the parties in the State Court Actions to resolve the separate allegations in those actions;

WHEREAS, this Consent Decree is intended to constitute a complete and final settlement of the United States' claim for damages and all other relief available to the United States under Colo. Rev. Stat. § 40-30-103 regarding the 416 Fire, as set forth in the complaint filed in the Civil Action;

WHEREAS, the United States and Defendants have agreed to certain additional undertakings designed to enhance the safe operations of DSNGR's railroad in light of changing climate conditions in the western United States which are included within the settlement between the parties;

WHEREAS, the United States and Defendants agree that settlement will avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the claim in the Civil Action, that settlement is in the public interest, and that entry of this Consent Decree is the most appropriate means of resolving the United States' claim for money damages under Colo. Rev. Stat. § 40-30-103 against Defendants in the Civil Action;

WHEREAS, this Consent Decree is neither an admission of liability by Defendants nor a concession by the United States that its claim is not well founded;

WHEREAS, the Court finds that this Consent Decree is a reasonable and fair settlement of the United States' claim against Defendants in the Civil Action, and that this Consent Decree adequately protects the public interest.

THEREFORE, without further adjudication of any issue of fact or law, and upon consent of the United States and Defendants, through their authorized representatives, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

## I.      JURISDICTION AND VENUE

1.      This Court has jurisdiction over the subject matter of the Civil Action pursuant to 28 U.S.C. § 1345.

2.      Venue is proper in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391(b) because  the events giving rise to this action occurred in Colorado.

## II.      APPLICABLITY

1.      The obligations of this Consent Decree shall apply to and be binding upon Defendants, their successors in interest, transferees, and assigns. In any action to enforce this Consent Decree against a Defendant, the Defendant shall not raise as a defense the

failure of any of its officers, directors, agents, employees, successors, or assigns or any person, firm, association, or corporation acting in concert or participation with the Defendant, to take any actions necessary to comply with the provisions of this Consent Decree.

2.      The transfer of ownership of any Defendant shall not alter or relieve Defendants of their obligation to comply with all of the terms of this Consent Decree.  At least thirty (30) days prior to the transfer of ownership of any Defendant, the party making such transfer shall provide written notice and a true copy of this Consent Decree to its successors in interest and shall simultaneously notify the United States at the addresses specified in Section VI below that such notice has been given.[1]  As a condition to any such transfer, the Defendant making the transfer shall reserve all rights necessary to comply with the terms of this Consent Decree.

### III.      <u>SCOPE OF CONSENT DECREE</u>

1.      This Consent Decree shall constitute a complete and final settlement of United States' claim for money damages arising from the Covered Conduct.

2.      Defendants' obligations under this Consent Decree are joint and several.

3.      This Consent Decree in no way affects the rights of the United States as against any person not a party to this Consent Decree and who is not released by the terms hereof.

4.      The United States reserves any and all legal and equitable remedies available to enforce the provisions of this Consent Decree and applicable law.

---

[1] Time periods in this Consent Decree shall be computed in accordance with Federal Rule of Civil Procedure 6(a).

5.      Nothing in this Consent Decree shall constitute an admission of fact or law by any party.

## IV.    **SPECIFIC PROVISIONS**

1.      Defendants shall collectively pay to the United States twenty million dollars ($20,000,000) ("Settlement Amount"), under the terms and conditions specified herein:

(A) Within forty-five (45) days after the entry of this Consent Decree, Defendants shall pay fifteen million dollars ($15,000,000) to the United States by electronic funds transfer pursuant to written instructions to be provided by the United States Attorney's Office for the District of Colorado.

(B) Over a period of ten (10) years, starting July 1, 2022, Defendants will pay to the United States five million dollars ($5,000,000), plus interest at 1.44% per annum, pursuant to the payment schedule attached at Exhibit A ("Defendants' Payments Over Time"). To the extent Exhibit A calls for any payment to be made on a Saturday, Sunday, or federal holiday, the payment deadline will be automatically extended to the business day immediately following such Saturday, Sunday, or federal holiday.

(C) If, at any time prior to the payment of Defendants' Payments Over Time, Defendant DSNGR or any of its subsidiaries, is sold, merged, or transferred, or a significant portion of its assets is sold, merged, or transferred into another non-affiliated entity, DSNGR shall promptly notify the United States at the addresses specified in Section VI below, and all remaining payments owed pursuant to this Consent Decree shall be accelerated and become immediately due and payable.

(D) The Settlement Amount may be prepaid, in whole or in part, without penalty or premium. If Defendants elect to prepay the Settlement Amount, or any portion thereof, interest shall accrue through the date on which Defendants make said prepayment.

2.      In the event that Defendants fail to pay any amounts due to the United States under Paragraph 1(A) this Consent Decree shall be null and void and the United States shall be entitled to pursue the Civil Action as if this Consent Decree had not been entered. If Defendants fail to pay the amounts due under 1(B) in this Section, Defendants shall be in default of their payment obligations ("Default").

(A) The United States will provide a written Notice of Default and Defendants shall have an opportunity to cure such Default within seven (7) calendar days from the date of receipt of the Notice of Default by making the payment due under Paragraph 1(A) or 1(B) and paying any additional interest accruing under the Consent Decree up to the date of payment. Notice of Default will be delivered to Defendants, or to such other representative, as Defendants shall designate in advance in writing.

(B) If Defendants fail to cure the Default within seven (7) calendar days of receiving the Notice of Default, and in the absence of an agreement with the United States to a modified payment schedule ("Uncured Default"), the remaining unpaid balance of the Settlement Amount shall become immediately due and payable, and interest on the remaining unpaid balance shall thereafter accrue at the rate of 9% per annum, compounded annually from the date of Default, on the remaining unpaid total (principal and interest balance).

(C) In the event of Uncured Default, Defendants agree that the United States, at its sole discretion, may (i) retain any payments previously made, (ii) pursue the Civil Action

against Defendants for the claims that would otherwise be covered by the releases provided in Paragraph 10 in this Section below with any recovery reduced by the amount of any payments previously made by Defendants to the United States under this Consent Decree, (iii) file a motion to enforce Paragraph 1(A) or 1(B) of this Section in the Civil Action, and/or (iv) exercise any other right granted by law, or under the terms of this Consent Decree, or recognizable at common law or in equity.  The United States shall be entitled to any other rights granted by law or in equity by reason of Default, including referral of this matter for private collection.  In the event that the United States files a motion to enforce pursuant to this Paragraph, Defendants agree to pay the United States immediately the greater of (i) a ten-percent (10%) surcharge of the amount collected, as allowed by 28 U.S.C. § 3011(a), or (ii) the United States' reasonable attorneys' fees and expenses incurred in filing such motion.  In the event that the United States opts to pursue the Civil Action for the claims that would otherwise be covered by the releases provided in Paragraph 10 in this Section pursuant to this Paragraph, Defendants waive and agree not to plead, argue, or otherwise raise any defenses of statute of limitations, laches, estoppel, or similar theories, to any civil claims that are (i) filed by the United States against Defendants within 180 days of an Uncured Default, and (ii) related to the Covered Conduct, except to the extent these defenses were available on July 2, 2019.  Defendants agree not to contest any offset or motion to enforce pursuant to this Paragraph, except on the grounds of actual payment to the United States.

3.     In exchange for valuable consideration provided through this Consent Decree, Defendants acknowledge the following:

(A) Defendants have reviewed their financial situation and warrant that based upon the pending settlements of both the claims made in the Civil Action and the related claims arising from the 416 Fire pending in the District Court for the La Plata County Colorado, they are solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I) and expect to remain solvent following payment to the United States of the Settlement Amount.

(B) In evaluating whether to execute this Consent Decree, the United States and Defendants intend that the mutual promises, covenants, and obligations set forth herein constitute a contemporaneous exchange for new value given to Defendants, within the meaning of 11 U.S.C. § 547(c)(1), and the United States and Defendants conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange.

(C) The mutual promises, covenants, and obligations set forth herein are intended by the United States and Defendants to, and do in fact, constitute a reasonably equivalent exchange of value.

(D) The United States and Defendants do not intend to hinder, delay, or defraud any entity to which Defendants were or became indebted to on or after the date of any transfer contemplated in this Consent Decree, within the meaning of 11 U.S.C. § 548(a)(1).

(E) If Defendants' obligations under this Consent Decree are avoided for any reason (including but not limited to, through the exercise of a trustee's avoidance powers under the Bankruptcy Code) or if, before the amounts due to the United States under Paragraph 1(A) or 1(B) in this Section are paid in full, Defendants or a third party commences a case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors seeking any order for relief of Defendants' debts, or to

9

adjudicate Defendants as bankrupt or insolvent, or seeking appointment of a receiver, trustee, custodian, or other similar official for Defendants or for all or any substantial part of Defendants' assets and, as to any third-party filing, the proceeding is not dismissed within 90 days of filing:

(i) the United States may rescind the releases in this Consent Decree and pursue the Civil Action and may seek to bring any civil and/or administrative claim, action, or proceeding against Defendants for the claims that would otherwise be covered by the releases provided in Paragraph 10 below; and

(ii) Defendants preserve and will be entitled to assert all claims and defenses available to claims brought by the United States.

(F) If any civil and/or administrative claim, action, or proceeding is brought by the United States under Paragraph 3(E), Defendants waive and shall not plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to the Civil Action brought by the United States within 120 days of written notification to Defendants that the releases have been rescinded pursuant to this Paragraph, except to the extent such defenses were available on July 2, 2019.

4.     The following are additional terms of the settlement between the United States and Defendant DSNGR which it must adopt and implement:

(A) Defendant DSNGR will adopt the industrial fire restrictions plan attached as Exhibit B (the "Industrial Fire Restrictions Plan").  For the avoidance of doubt, DSNGR agrees to comply with the terms of the Industrial Fire Restrictions Plan.

(B) Defendant DSNGR must prepare an annual operating and fire prevention plan (the "Operating and Fire Prevention Plan").  The Operating and Fire Prevention Plan must

be submitted to the United States Forest Service for review and approval each year by the first day of April which approval will not be unreasonably withheld. For any activity on DSNGR's right-of-way for which a permit is required under applicable law or regulation, DSNGR must apply for a United States Forest Service permit or to such other agency having jurisdiction over the proposed activity such as the Army Corps of Engineers.

(C) DSNGR must identify and retain an independent consultant with specific expertise in railroad operations, fire mitigation, and fire prevention (the "Independent Consultant"). DSNGR must submit to the United States by May 1, 2022, the curriculum vitae, work history, and references, of the Independent Consultant. The United States shall review the proposal and indicate its approval or disapproval within seven days, which approval shall not be unreasonably withheld. If disapproved, the United States must specify the reasons for disapproval. If that candidate is not approved, DSNGR must locate another candidate within a reasonable time from the date of the United States' rejection of the previous candidate for approval or disapproval, which approval shall not be unreasonably withheld. Once an Independent Consultant candidate is approved by the United States, DSNGR shall retain the Independent Consultant within fourteen days of the United States' approval. DSNGR agrees to use its best efforts to identify, seek approval, and retain the Independent Consultant by June 1, 2022. At a minimum, DSNGR must have the Independent Consultant:

(i) inspect and report on DSNGR's operations relating to fire mitigation and fire prevention each year for compliance with the Industrial Fire Restriction Plan and the Operating and Fire Prevention Plan (collectively the "Plans") and, if necessary, to make recommendations each year for inclusion in the Operating and

Fire Prevention Plan to improve DSNGR's operations relating to fire mitigation and fire prevention;

(ii) prepare an annual report summarizing the Independent Consultant's recommendations to improve Defendants' operations relating to fire mitigation and fire prevention (the "Fire Operations Report");

(iii) submit the Fire Operations Report each year to the United States Forest Service by the first day of April. If the Independent Consultant's recommendation is to amend or add provisions to the Operating and Fire Prevention Plan, such amendment and addition will be made only if both DSNGR and the United States Forest Service agree; and

(iv) make the Independent Consultant while working for DSNGR available at reasonable times for joint consultation with the United States Forest Service and DSNGR during the year for any inquiries concerning the Fire Operations Report;

(v) perform an annual audit of DSNGR's operations relating to fire mitigation and fire prevention, of DSNGR's compliance with the Fire Operations Report in this Paragraph, and of DSNGR's compliance with the Operating and Fire Prevention Plan in Paragraph 4(B) of this Section;

(vi) complete a report of the audit's findings each year (the "Annual Audit Report"); and

(vii) submit the Annual Audit Report each year to the United States Forest Service by the first day of November.

DSNGR must submit a certification with the Fire Operations Report that certifies DSNGR will implement the mutually agreed recommendations contained in the Fire Operations Report within a reasonable, specified timeline.

(D) DSNGR must hire or designate a current employee as a Fire Management Officer (FMO) by May 1, 2022. At a minimum, the FMO must be qualified as an Incident Commander Type 5 and a Prescribed Fire Burn Boss Type 3. The FMO's responsibilities must include implementing, managing, and ensuring compliance with the Operating and Fire Prevention Plan in Paragraph 4(B). The FMO must provide monthly certifications to the United States Forest Services that DSNGR is complying with the Operating and Fire Prevention Plan in Paragraph 4(B) of this Section and that DSNGR is implementing the recommendations contained in the Fire Operations Report in Paragraph 4(C) of this Section.

(E) DSNGR must submit a digest of its complete daily reports, which shall include daily fire reports, to the United States Forest Service each week.

5.      Defendants will create a self-insured catastrophic wildfire fund (the "Fund") by March 1, 2022, that Defendants contribute a dollar value of one hundred thousand dollars ($100,000) per year. This Fund will be created using either a Morgan Stanley no risk investment account or a traditional commercial bank savings account. Whether a Morgan Stanley no risk investment account or a traditional commercial bank savings account is established will be determined by each account's annual interest rate return and associated fees. The Fund will be used for reimbursing costs incurred by the United States for responding to or suppressing a wildfire allegedly caused by DSNGR's operations and will be available to fund self-insured retainage and/or third party claims in

excess of available insurance proceeds. The Fund may be annually reevaluated and changed to ensure it is gaining the best interest rate possible. Defendants will contribute one hundred thousand dollars ($100,000) annually to the Fund until the Fund reaches a principal amount that can accrue annual interest of one hundred thousand dollars ($100,000) or more or until Defendants are able to find wildfire insurance coverage of at least fifteen million dollars ($15,000,000), and that such coverage amount shall not be reduced for payments for legal defense costs or fees. When the Fund reaches fifteen million dollars ($15,000,000), Defendants' annual contributions to the Fund may be halted. The Fund shall at all times remain the sole property of the Defendants and shall be available to fund all claims made by any third party or the United States relating to wildfires allegedly caused by DSNGR's railroad operations.

6. Defendants agree that they will retain a minimum of three million dollars ($3,000,000) in wildfire protection (the "Wildfire Protection") at all times, and that such coverage amount shall not be reduced for payments for legal defense costs or fees. The Wildfire Protection may be made up of a combination of deductible/self-insured retention and wildfire insurance coverage.

7. Defendants will review the commercial availability of insurance coverage without a wildfire exclusion clause on an annual basis and will provide written documentation of their findings to the United States. These findings will be supported by Defendants' insurance broker or other third party means. If the United States requests, Defendants shall make available any employee, agent, representative, or contractor utilized by Defendants for purposes of seeking insurance coverage to be available for questioning by representatives of the United States concerning efforts made to determine the

commercial availability of such insurance.  If additional insurance coverage without a wildfire exclusion clause becomes available in not less than $1,000,000 coverage increments, Defendants agree that they will retain such insurance so long as the premium increase does not cause Defendants' annual insurance premium for such policies, including the minimum $3,000,000 coverage, to exceed six hundred thousand dollars ($600,000).

8.      Defendants may, in their sole discretion, decide to pursue litigation regarding the Comprehensive Liability Insurance Policy – Railroad, Policy No. SCO 8253403 22 (the "Insurance Policy").  If Defendants decide to pursue litigation regarding the Insurance Policy, the net amount recovered in that litigation recovered in excess of (i) $7,250,000 plus (ii) attorney fees, costs, and interest, will be split as follows: 60% to Defendants, 10% to the Fund, and 30% to the United States.

9.      Notwithstanding the terms of this Consent Decree, and notwithstanding the submission of information to, nor the review and authorization by the United States of any aspect of DSNGR's operations, DSNGR bears sole and ultimate responsibility for how it operates and for how it conducts fire risk mitigation and fire prevention activities.  DSNGR will not cite or rely on any aspect of this Consent Decree, nor any information exchanged pursuant to this Consent Decree, including but not limited to, the United States' review or authorization of activities, plans, reports, applications, permits, or certifications, as a defense or claim for the purpose of limiting DSNGR's' liability, or for purposes of seeking recoupment of any damages paid by DSNGR, with respect to any party, as to a fire caused, or alleged to have been caused by, DSNGR.

10.      Subject to the exceptions listed in Paragraph 11 below concerning excluded claims, and conditioned upon the full payment of the Settlement Amount, and the United

States' receipt thereof, the United States hereby fully and finally releases Defendants, their officers, directors, shareholders, employees, agents and insurers and their predecessors, successors, and assigns connected with them from all liability or any claims, demands, obligations, actions, causes of action, damages, costs, losses, attorney's fees, and expenses, including any claims for compensatory or punitive damages, which the United States has or may have against them for the Covered Conduct.

11.     The United States and Defendants acknowledge and agree that they are mutually resolving only the Covered Conduct, and not any other claims that the United States has, or may have, relating to the Covered Conduct.  Notwithstanding the release given in Paragraph 10 of this Section, or any other term of this Consent Decree, the following claims of the United States are specifically reserved and are not released:

(A) Any liability arising under Title 26, United States Code (*i.e.*, the Internal Revenue Code);

(B) Any criminal liability, subject to a comfort letter that there is no current or open investigation by the U.S. Attorney's Office for the District of Colorado now existing against Defendants or their officers, directors, shareholders, employees and agents arising out of the Covered Conduct;

(C) Any administrative liability, including the suspension and debarment right of any federal agency;

(D) Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct; and

(E) Any liability based upon obligations created by this Consent Decree.

12.     Defendants fully and finally release the United States, its agencies, officers,

agents, employees, and servants, from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) that Defendants have asserted, could have asserted, or may assert in the future against the United States, its agencies, officers, agents, employees, and servants, related to the Covered Conduct and the United States' investigation and prosecution thereof.

## V.  DISPUTE RESOLUTION

1.      Except as expressly provided for in this Consent Decree, in Paragraph 2 of Section IV, the Dispute Resolution procedures of this Section V shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.

2.      Any dispute that arises with respect to the meaning or requirements of this Consent Decree shall, in the first instance, be subject to negotiations between the United States and Defendants to attempt to resolve such dispute.  The period for negotiations shall not extend beyond forty-five (45) days, beginning with the date written notice from one party to the other affected party or parties that a dispute exists, unless that period is modified in writing by those parties.  The written notice commencing dispute resolution may include any factual data, analysis, or opinion supporting the parties' position and any supporting documentation relied upon by that party.  The party responding to the written notice shall, no later than thirty (30) days after receiving written notice of the dispute, provide a written response that may include any factual data, analysis, or opinion supporting the parties' position and any supporting documentation relied upon by that party.  If a dispute between the United States and Defendants cannot be resolved by negotiations, then either party may, within fourteen (14) days after the end of the negotiations period, file a motion with the Court seeking resolution of the dispute and serve

the motion on the other party in accordance with Section VI.  The motion shall set forth the nature of the dispute and a proposal for its resolution.  The non-filing party shall have thirty (30) days to respond to the motion and propose an alternate resolution.

3.      If the United States believes that a dispute is not a good faith dispute, or that a delay would pose or increase a threat of harm to the public, it may move the Court for a resolution of the dispute prior to the expiration of the 45-day period for informal negotiations.  Defendants shall have fourteen (14) days to respond to the motion and propose an alternate resolution.

4.      In any dispute brought under this Section, the moving party shall bear the burden of demonstrating that their position complies with this Consent Decree and better furthers the objectives of the Consent Decree.

5.      Defendants and the United States, on behalf of BLM and USDA, agree to accept service of process by mail with respect to all disputes arising under this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

6.      The exclusive jurisdiction and venue for any disputes arising under or with respect to this Consent Decree is the United States District Court for the District of Colorado, and this Consent Decree is governed by the laws of the United States and to the extent applicable, the statutory and common law of the State of Colorado without regard to its conflicts of laws provisions.

7.      Unless otherwise ordered by the Court, the filing of a motion asking the Court to resolve a dispute shall not extend or postpone any obligation of Defendants under

18

this Consent Decree.

## VI.   ADDRESSES

1.     Whenever, under the terms of this Consent Decree, notice is required to be given or a document is required to be sent by one party to another, it shall be directed to the individuals at the addresses set forth on Exhibit C, hereto, unless those individuals or their successors give notice of a change to the other parties in writing.  Except as otherwise provided, notice to a party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the Consent Decree regarding such party.

## VII.   COSTS OF SUIT

1.     Each party to this Consent Decree shall bear its own costs and attorneys' fees in connection with the investigation related to, litigation of, and resolution of the Civil Action, including the preparation and performance of this Consent Decree.   Should Defendants subsequently be determined by the Court to have violated the terms or conditions of this Consent Decree, Defendants shall be liable for any costs or attorneys' fees incurred by the United States in any action against Defendants for noncompliance with or enforcement of this Consent Decree.

## VIII.   CONTINUING JURISDICTION OF THE COURT

1.     This Court shall retain jurisdiction over the Civil Action in order to enforce or modify the Consent Decree consistent with applicable law or to resolve all disputes arising hereunder as may be necessary or appropriate for construction or execution of this Consent Decree.  During the pendency of the Consent Decree, any party may apply to the Court for any relief necessary to construe and effectuate the Consent Decree or to modify

any provision hereof or terminate the Consent Decree in its entirety consistent with Sections IX and X, below.

## IX.    MODIFICATION

1.    Any modification of this Consent Decree shall be in writing and shall not take effect unless signed by both the United States and Defendants and approved by the Court.

2.    The Industrial Fire Restrictions Plan attached as Exhibit B is subject to the parties' annual review and appropriate modification according to its terms without further application to or modification by the Court of this Consent Decree. The provisions of this Consent Decree shall likewise be subject to the parties' annual review to determine whether its provisions are necessary for the continued safe operation of DSNGR's line of railroad and whether any of the provisions hereof should be terminated or modified in the best interests of DSNGR and the public. Neither the Industrial Fire Restrictions Plan nor this Consent Decree shall be modified without the written consent of both Parties, unless otherwise order by the Court.

## X.    TERMINATION

1.    This Consent Decree may be terminated by the United States and Defendants through a joint motion submitted to the Court for termination of the Consent Decree at any time.

2.    Unless sooner terminated pursuant to Paragraph 1 of this Section, this Consent Decree will automatically expire without further application by either Party after 10 years from the Court's entry of this Consent Decree.

## XI.    FORMATION AND EXECUTION

1.      Each of the undersigned representatives certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the party he or she represents to this document.

2.      The United States and Defendants warrant and represent that they freely and voluntarily enter into this Consent Decree without any degree of duress or compulsion whatsoever.  The United States and Defendants further warrant and represent that no other party or its representative has made any promise, representation, or warranty, express or implied, except as expressly set forth in this Consent Decree, and that neither the United States nor Defendants have relied on any inducements, promises, or representations made by any party to this Consent Decree, or its representatives, or any other person, except as expressly set forth herein.

3.      For purposes of construction, this Consent Decree shall be deemed to have been drafted by the United States and Defendants.  The words of this Consent Decree shall not, therefore, be construed against any party to the Consent Decree for that reason in any subsequent dispute, but shall be construed as a whole, and so as to affect their fair meaning.

4.      This Consent Decree constitutes the complete agreement among the United States and Defendants and supersedes and replaces all prior negotiations and agreements, whether written or oral, regarding the resolution of the Covered Conduct in this Civil Action.

5.      This Consent Decree may be signed in counterparts.  Such counterpart signature pages shall be given full force and effect, and their validity shall not be

challenged on that basis.

6.    The United States and Defendants agree to cooperate fully and to execute any and all supplementary documents and to take all additional actions that may be necessary or appropriate to give full force and effect to the terms and intent of this Consent Decree.

7.    The United States and Defendants consent to the disclosure of this Consent Decree and information about the Covered Conduct to the public.

8.    Upon its entry by the Court, this Consent Decree shall have the force and effect of a final judgment.


IT IS SO ORDERED.

Dated and entered this __24th__ day of __March__, 2022.

_____
United States District Judge

### THE UNITED STATES OF AMERICA

UNITED STATES DEPARTMENT OF JUSTICE

COLE FINEGAN
United States Attorney
District of Colorado

_____          Dated: __3/21/22__
Jacob Licht

_____          Dated: __3/21/2022__
Katherine Ross

Jacob Licht
Katherine Ross
Nick Deuschle
Assistant United States Attorneys
1801 California Street, 16th Floor
Denver, CO 80202

UNITED STATES DEPARTMENT OF AGRICULTURE
UNITED STATES FOREST SERVICE

**LEIGH SELLARI** Digitally signed by LEIGH SELLARI
Date: 2022.03.17 09:51:30 -06'00'          Dated: __3/17/2022__
_____
Leigh Sellari
Regional Attorney, Mountain Region
Office of the General Counsel
U.S. Department of Agriculture

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF LAND MANAGEMENT

_____          Dated: __3/16/22__
Ann C. Umphres
Attorney-Advisor
Office of the Solicitor, Rocky Mountain Region
U.S. Department of Interior

23

**DEFENDANTS**

_____   Dated: 03/16/2022
DURANGO & SILVERTON NARROW GAUGE
RAILROAD COMPANY, by its:
President

_____   Dated: 03/16/22
AMERICAN HERITAGE RAILWAYS, INC., by its
CHAIR/CEO

_____   Dated: 03/21/22
Richard A. Waltz, Esq.
Waltz / Reeves
1660 Lincoln St. #2510
Denver, CO 80264
Attorneys for Defendants

_____   Dated: 03/18/2022
Edward T. Lyons, Esq.
Stuart N. Bennett, Esq.
Jones & Keller P.C.
1675 Broadway, 26th Floor
Denver, CO 80202
Personal counsel to Defendants

24

**EXHIBIT A**

**Defendants' Payments Over Time**

|  | Due Date | Payment Amount | Principal | Balance (on principal) | Interest at 1.44% |
|---|---|---|---|---|---|
| Interest Start Date | 7/1/2022 |  |  | $5,000,000 |  |
| Installment 1 | 7/1/2022 | $250,000 | $250,000 | $4,750,000 | $0 |
| Installment 2 | 1/1/2023 | $284,200 | $250,000 | $4,500,000 | $34,200 |
| Installment 3 | 7/1/2023 | $282,400 | $250,000 | $4,250,000 | $32,400 |
| Installment 4 | 1/1/2024 | $280,600 | $250,000 | $4,000,000 | $30,600 |
| Installment 5 | 7/1/2024 | $278,800 | $250,000 | $3,750,000 | $28,800 |
| Installment 6 | 1/1/2025 | $277,000 | $250,000 | $3,500,000 | $27,000 |
| Installment 7 | 7/1/2025 | $275,200 | $250,000 | $3,250,000 | $25,200 |
| Installment 8 | 1/1/2026 | $273,400 | $250,000 | $3,000,000 | $23,400 |
| Installment 9 | 7/1/2026 | $271,600 | $250,000 | $2,750,000 | $21,600 |
| Installment 10 | 1/1/2027 | $269,800 | $250,000 | $2,500,000 | $19,800 |
| Installment 11 | 7/1/2027 | $268,000 | $250,000 | $2,250,000 | $18,000 |
| Installment 12 | 1/1/2028 | $266,200 | $250,000 | $2,000,000 | $16,200 |
| Installment 13 | 7/1/2028 | $264,400 | $250,000 | $1,750,000 | $14,400 |
| Installment 14 | 1/1/2029 | $262,600 | $250,000 | $1,500,000 | $12,600 |
| Installment 15 | 7/1/2029 | $260,800 | $250,000 | $1,250,000 | $10,800 |
| Installment 16 | 1/1/2030 | $259,000 | $250,000 | $1,000,000 | $9,000 |
| Installment 17 | 7/1/2030 | $257,200 | $250,000 | $750,000 | $7,200 |
| Installment 18 | 1/1/2031 | $255,400 | $250,000 | $500,000 | $5,400 |
| Installment 19 | 7/1/2031 | $253,600 | $250,000 | $250,000 | $3,600 |
| Installment 20 | 1/1/2032 | $251,800 | $250,000 | -0- | $1,800 |
|  |  |  |  |  |  |
|  |  |  | $5,000,000 |  |  |

## **EXHIBIT B**

**Industrial Fire Restrictions Plan**

[EXHIBIT B FILED WITH COURT AS SEPARATE ATTACHMENT]

## **EXHIBIT C**

<u>CONTACT INFORMATION FOR NOTICES TO PARTIES</u>

<u>To U.S. Department of Agriculture</u>:

Arthur R. Kleven
Deputy Regional Attorney, Mountain Region
Office of the General Counsel
U.S. Department of Agriculture

1617 Cole Blvd., Ste. 385E
Lakewood, CO  80401-3305
Arthur.Kleven@usda.gov

<u>To U.S. Department of Interior Bureau of Land Management</u>:

Ann C. Umphres
Attorney-Advisor
Office of the Solicitor, Rocky Mountain Region
U.S. Department of Interior

755 Parfet St., Suite 151
Lakewood, CO  80215
ann.umphres@sol.doi.gov

<u>To U.S. Department of Justice</u>:

Jacob Licht
Katherine Ross
Nick Deuschle
Assistant United States Attorneys
1801 California Street, 16th Floor
Denver, CO  80202
Jacob.Licht-Steenfat@usdoj.gov
Katherine.Ross@usdoj.gov
Nick.Deuschle@usdoj.gov

<u>To Defendants</u>:

John A. Harper
Matt Cunningham
American Heritage Railways, Inc.
The Durango & Silverton Narrow Gauge Railroad Company
479 Main Ave.
Durango, CO 81301
johnharper@durangotrain.com
mcunningham@durangotrain.com

with a copy to:

Edward T. Lyons, Esq.
Stuart N. Bennett, Esq.
Jones & Keller, P.C.
1675 Broadway, 26th Floor
Denver, CO 80202
elyons@joneskeller.com
sbennett@joneskeller.com